**SEALED**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PAVONIX, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 13-10348-LTS |
| BARCLAYS BANK PLC, | ) | |
| | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION ON
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

November 25, 2015

DEIN, U.S.M.J.

## I.   INTRODUCTION

The plaintiff, Pavonix, Inc. (formerly known as Softscape, Inc. and referred to herein as "Softscape"), was a company engaged in the business of supplying software and service for online employee performance reviews.    The defendant, Barclays Bank PLC ("Barclays"), was one of its customers pursuant to a contract that was set to expire in October 2009, but was extended by agreement through June 15, 2010.    Softscape alleges that shortly before the time the contract was set to expire, Barclays wrongfully induced Softscape to update Barclays' software, at substantial cost to Softscape, by misleading Softscape into believing that Barclays intended to further extend its agreement with Softscape.    In reality, according to Softscape, Barclays had no intention of entering into a new contract with Softscape, but was negotiating with, and eventually entered into a contract with, another software provider.    Softscape has

brought this action alleging that Barclays is liable for fraud (Count I), unjust enrichment (Count II), and unfair or deceptive trade practices in violation of Mass. Gen. Laws ch. 93A (Count III).

This matter is before the court on "Defendant Barclays Bank PLC's Motion for Summary Judgment." (Docket No. 85). By this motion, Barclays is seeking judgment in its favor on all counts of the Complaint on the grounds that (1) Softscape lacks standing to maintain this action because it allegedly sold these claims to a third party in 2010, (2) the claims of fraud and unjust enrichment are time-barred, (3) the 93A claims must fail either because the laws of England govern this dispute or because the alleged misconduct did not take place "primarily and substantially" within the Commonwealth of Massachusetts, (4) the fraud and 93A claims must fail because the undisputed facts establish that Softscape did not, as a matter of fact or law, rely on any oral representations, and (5) Softscape cannot maintain a claim for unjust enrich-ment as a matter of law    Softscape opposes the motion for summary judgment in its entirety.

As detailed herein, this court finds that Softscape did not sell these claims to a third-party and has standing to maintain this action.    This court finds further that there are material facts in dispute which preclude the entry of summary judgment on any of the claims. Therefore, this court recommends to the District Judge to whom this case is assigned that Barclays' motion for summary judgment (Docket No. 85) be DENIED.

## II.   <u>STATEMENT OF FACTS</u>[1]

In ruling on a motion for summary judgment, the facts must be viewed in the light most

favorable to the non-moving party.   <u>See</u> <u>Vineberg v. Bissonnette</u>, 548 F.3d 50, 56 (1st Cir.

2008).   Applying this principle, the relevant facts are as follows.

### <u>Overview of the Parties' Contractual Relationship</u>

Softscape and Barclays are parties to an "Agreement for the Supply of Services," which

commenced on November 15, 2006 and was initially set to expire on October 31, 2009.   (Ex. 4;

PF ¶¶ 1, 2).   Pursuant to this Agreement, Softscape provided Barclays with software called

"PD Online," which was used to conduct employee performance reviews.   (DF ¶ 10).   At the

time the contract began, Barclays was provided with Version 10 of the software.   (PF ¶ 3).   In

or about 2008/2009, Softscape began marketing Version 12, which it believed would improve

the product and address various bugs in the software.   (PF ¶ 4).   In January 2009, Softscape

and Barclays were engaged in discussions regarding the possibility of upgrading Barclays to

Version 12, but Barclays was reluctant to do so.   (PF ¶¶ 6-7).   Softscape, on the other

hand, felt that the transition to Version 12 was necessary because Version 10 had become

outdated and, in its view, Barclays' hardware was unable to properly accommodate Version 10

any longer.   (PF ¶ 8).   Moreover, there is evidence that Softscape was no longer intending to

---

[1]   The facts are derived from the following materials: (1) Defendant's Statement of Undisputed Facts (Docket No. 87) ("DF"), (2) Plaintiff's Response to Defendant's Statement of Undisputed Facts (Docket No. 99) ("PR"), (3) Plaintiff's Statement of Facts (Docket No. 98) ("PF"), (4) Defendant's Response to Plaintiff's Statement of Facts (Docket No. 108) ("DR"), (5) the exhibits submitted by the parties, which are consecutively numbered (Docket Nos. 88, 100, 109) ("Ex. ___"), and (6) the Affidavit of Marcus Smith QC (Docket No. 82) detailing English law.

support Version 10.    (See DR ¶ 8).    The events surrounding the upgrade to Version 12 form the basis of this dispute.

The parties' Agreement provided that it could be terminated on at least three months' notice before the expiration of the Initial Term on October 31, 2009.    (DR ¶ 10).    It is Softscape's contention that instead of terminating the contract when faced with Barclays' reluctance to upgrade to Version 12, it undertook an extensive upgrade, including customiza- tion to meet Barclays' specific needs, based on representations made by Barclays that it would extend the parties' Agreement.    It is further Softscape's contention that Barclays never had any intention to do so.    As detailed herein, reading the record in the light most favorable to Softscape, there is evidence that Barclays represented to Softscape that it intended to try and reach a mutually acceptable contract extension, when, in fact, it never had any intention of signing such an agreement with Softscape.

### The Upgrade to Version 12

As detailed above, in January 2009, Softscape and Barclays were discussing the need to upgrade Barclays to Version 12.    (PF ¶ 6).    According to Softscape's CEO, David Watkins, it was at this time that Barclays made oral representations that it was going to extend its contract with Softscape for an additional three years after it expired.    (Ex. 1 at 146).    While Mr. Watkins' characterization of the parties' discussions is disputed, it is agreed that as of March 26, 2009, Softscape and Barclays had agreed upon a plan to upgrade to Version 12 all divisions of Barclays that Softscape had already been servicing, including Barclaycard, Group Centre, GRCB Center and BCB.    (PF ¶ 12).    By June 5, 2009, Barclaycard was live on Version 12.    (PF

¶ 13).    The other divisions were reluctant to transfer to Version 12, as a result of which

Softscape was being asked to support two systems.    (Ex. 47).    The other divisions did not go

live on Version 12 until September 2009.    (PF ¶ 14).

### Cost for the Upgrade

It is Barclays' contention that Softscape agreed to complete the upgrade to Version 12

free of charge, and it points to various email communications, including an email dated

December 23, 2008, in which Softscape wrote:

> We will be upgrading the system in January (for no cost) and strongly
> recommend Barclays deploys it.    One of the challenges we have had with
> performance issues we experienced in Q4 was that the platform is getting on
> for 3 years old.    We believe v12 will correct the issues.    There are also some
> hosting infrastructure discussions we'll need to have.

(DF ¶ 41; Ex. 9).    Moreover, Barclays argues that Softscape was contractually obligated to

provide the upgrade to Version 12 free of charge.    (See DF ¶¶ 42, 43).

For its part, Softscape argues that the only reason it agreed to provide the upgrade,

instead of simply letting the contract expire by its terms in October 2009, was because Barclays

had represented that it intended to extend the contract.    (Pl. Mem. (Docket No. 97) at 4-5; PF

¶¶ 10-11).    Moreover, Softscape asserts that in connection with the upgrade, "Barclays had

required of Softscape numerous customizations and enhancements none of which Softscape

was obligated to migrate to an upgraded version of the software for free."    (PR ¶¶ 42-43).

Barclays agrees that it had to pay for some specific enhancements, but contends that it was

entitled to other enhancements and customizations free of charge.    (DR ¶¶ 7, 9).    Based on

the present record, it does not appear that Barclays was willing to accept Version 12 without

[5]

enhancements and customizations.   (See DR ¶ 9).   The issue whether Softscape was

contractually required to provide Version 12 in a form acceptable to Barclays free of charge, or

whether it provided the acceptable Version 12 free of charge in reliance on Barclays' promise to

renew the contract, remains in dispute.

### Events of May 2009

As noted above, by June 5, 2009, Barclaycard was live on Version 12, but the other

divisions were not by their own choice, and over Softscape's objection.   (See Ex. 47).   As a

result, Softscape was obligated to maintain two support systems, and it submitted a bill to

Barclays for this dual effort sometime in May 2009.   (Ex. 47).   As Barclays described in its

internal communications, it responded to Softscape's bill by "politely" telling Softscape to "go

shove it."   (Ex. 47).   In order to avoid paying Softscape, Barclays, again in its own words, held

out the "carrot" of a contract renewal to Softscape.   (Ex. 47).   Thus, according to its internal

communications, to get Softscape to back down on its efforts to collect payment for its work,

and to give Softscape incentive to complete the upgrade in mid-August, Barclays "agreed" with

Softscape "to extend the contract for 18 months" with "the option to extend for a further 12

months."   (Ex. 47 ("Our strategy that has been agreed with David [Watkins] is to extend the

contract for 18 months which will allow us to complete one full cycle (2010 PD).   We will also

have the option to extend for a further 12 months.")).

Despite its internal acknowledgment that it had "agreed" with Softscape to extend the

contract, Barclays argues that Softscape, as a matter of law, cannot have reasonably relied on

any such representation since it was clear that the material terms of any agreement remained

[6]

open.    In support of this position, Barclays points to its email to Softscape dated May 29, 2009

in which Barclays refused to pay for the dual support,[2]  and did not confirm that an agreement

had been reached, but rather stated that it would start negotiations.    Specifically, Peter

Gilbert of Barclays wrote in relevant part as follows:

> I have discussed this with my senior management, and our position remains
> unaltered.   We are not prepared to accept costs which have not been tabled
> up front and budgeted.   However, we acknowledge the amount of invest-
> ment you have made in version 12, particularly at this stage in the contract
> lifecycle.   In consideration of this, <u>we are prepared to commit now to start
> the negotiations for a contract renewal</u>.   This will need to be in accordance
> with our ASP contract that will be more detailed than the current one.   This
> will be beneficial to both parties since it will provide greater clarity.   At this
> point, we can indicate that we would want to extend for 18 months with an
> option to extend for a further 12 months.   This will allow us to use version
> 12 for a full annual cycle (2010), and start deployment to new users.

(Ex. 30 (emphasis added)).    He further concluded the email by stating:

> Business units are no longer permitted to deviate from our strategic products
> and we consider Softscape to be our strategic platform for Performance
> Development.   We are keen to work with you to place the relationship on
> firmer footing, and hope that our intention regarding the contract is a clear
> demonstration of this.

(<u>Id.</u>).    Softscape notified Barclays that this proposal was "accepted."    (Ex. 48).

Contrary to Barclays' contention, Softscape is not arguing that an enforceable extension

existed as of May 29, 2009.    It is arguing, however, that this communication is evidence that

Barclays wanted to induce Softscape to continue with the upgrade, at no charge to Barclays, by

---

[2]  In an email dated May 28, 2009, Softscape had written to Barclays leaving it up to Barclays "to decide what is fair" in connection with Softscape having to continue to support Version 10 because Version 12 was not being used at all divisions.    (Ex. 48)

promising to pursue negotiations with the goal of consummating an agreement.    Moreover, Softscape contends, other evidence establishes that Barclays was using the promise of an extension as a "carrot" to lure Softscape into providing it with free upgrade work, and that Barclays never had an intention of ever finalizing an extension with Softscape.    As detailed below, there are facts from which a jury can conclude that Softscape states a viable claim.

Barclays also points to the May 29, 2009 communication as triggering the statute of limitations for Softscape's fraud and unjust enrichment claims.    Thus, this communication made it clear that Barclays was not contemplating a three year extension, but rather an 18 month extension with an option to renew for another year.    There is evidence in the record that this reduced period made David Watkins feel "jerked around" and "screwed."    (See DF ¶ 71; Ex. 1 at 148-56 (David Watkins responds affirmatively to questions "did you feel that you'd been jerked around?" and "Did you feel that you'd been screwed?")).    As detailed below, however, this court finds that the statute of limitations was not triggered at this time since there was abundant evidence that even with a change to an 18-month extension period, Softscape was still willing to continue negotiations with Barclays, and was still being assured that a contract was likely.    (See Ex. 1 at 149-57).    The crux of the alleged fraud is whether Barclays intended to enter into an extension at all.

### Continued Contract Negotiations

After its letter of May 29, 2009, Barclays continued to assure Softscape that an extended contract was forthcoming.    For example, but without limitation, on June 10, 2009 Barclays sent an email to make sure that Softscape understood that the terms of the new

contract would be presented in a new standard form used by Barclays, and wrote therein that

"Barclays recognises [sic] the great efforts from Softscape and looks forward to renewing the

agreement."   (Ex. 48).    The parties continued to exchange drafts of agreements through

February 9, 2010.   (PF ¶ 17; DR ¶ 17; Exs. 50-56).    Throughout this time, Softscape continued

to work on the upgrade to Version 12 for Barclays' other divisions free of charge to Barclays.

Barclays Group Centre, GRCB Centre and BCB went live with Version 12 in September 2009.

(PF ¶ 14).

### Evidence of Barclays' Intent

Viewing the record in the light most favorable to Softscape, there is evidence from

which a jury can find that Barclays had no intention of extending its agreement with Softscape

and that it knew that Softscape was providing the upgrade free of charge with the expectation

of obtaining the extension.    The record shows that Barclays began considering an alternative

vendor, Cornerstone OnDemand ("CSOD") at least as early as February 2009.    (PF ¶ 21).    As

noted above, by at least May 28, 2009, Barclays had developed a strategy of "offering the

carrot of a start of negotiations for a contract extension" with the plaintiff in order to avoid

paying for the dual support systems Softscape was providing for Versions 10 and 12.    (Ex. 47).

By July 2009, Barclays was soliciting and receiving proposals from CSOD for product that would

replace Softscape.    (PF ¶¶ 23-24).    In an internal email dated August 20, 2009, Barclays was

expressly contemplating "stall[ing] with Softscape" by agreeing to an extension of the contract

until January 31, 2010, when it would migrate the project to CSOD and "fire the bullet" to end

its relationship with Softscape.    (Ex. 68).    As Peter Gilbert of Barclays wrote in an internal

email dated August 28, 2009,

> We have to string Softscape along until we get agreement on the renewal,
> then I'll drop them the bombshell.   Then, once they have renewed, I hope to
> be able to fire them in January!   That will be a great day....

(Ex. 69).

Barclays' internal communications can be interpreted to reveal a strategy of leading

Softscape along by confirming to Softscape that the parties had "agreed [to] the commercial

terms" of an extension, but then blaming the lawyers for the delay in resolving "the legal

issues[.]"   (Ex. 75 (dated October 9, 2009)).    This was seemingly designed to buy time until

Barclays could "get rid of" Softscape.    (Ex. 75).    There is evidence that while Barclays was

giving the appearance of negotiating a long term contract with Softscape, Barclays actually was

allocating its internal resources "to manage the migration of PD Online from Softscape to

Cornerstone[.]"    (Ex. 36 (email dated October 22, 2009)).    For instance, in an internal email

dated October 27, 2009, Barclays wrote that it had decided to proceed with Cornerstone, and

described its plans as follows:

> We are still negotiating with Softscape regarding an extension of the current
> contract to get us to the end of this year's PD cycle.   We will then be in a
> position to end the relationship.   Softscape are not yet aware of our
> intention to migrate to a new solution, so this activity is confidential.

(Ex. 74).   Other internal Barclays communications acknowledge that Barclays was continuing

to negotiate the contract with Softscape "to demonstrate that we are serious whilst continuing

to work on the replacement" with Cornerstone.    (PF ¶¶ 42, 43; Ex. 79 at BAR20355).    Read

most favorably to Softscape, Barclays' documents also confirm that it was using "pretexts" to

end the relationship with Softscape, as well as to obtain its data from Softscape, "under the guise of an internal audit/data privacy requirement" so that it could migrate onto the new system smoothly.   (PF ¶ 43; Ex. 79 at BAR20356; <u>see also</u> Exs. 77-78).

Unbeknownst to Softscape, Barclays entered into a contract with CSOD on January 14, 2010.   (PF ¶ 33).   As Cornerstone acknowledged internally at that time: "this is highly confidential (Softscape don't know yet they'll be replaced – only top execs at Barclays are aware . . . Code name; project Pinnacle . . . don't speak externally at all about this one)."   (Ex. 80 (email dated January 18, 2010)).   On February 25, 2010, Barclays notified Softscape, for the first time, that the contract would not be renewed when it expired on April 30, 2010.   (PF ¶ 34).[3]   On March 8, 2010, after it received the termination notice, Softscape sent Barclays an invoice dated February 26, 2010 "for the time spent on upgrading Barclay's system to Version 12" in the amount of £ 451,007.50.   (PF ¶ 35; Ex. 17).   It was Softscape's position that the funds were due because "Barclays has reneged on its promise to Softscape to renew the contract for 18 months" and the upgrade had been done free of charge "based on the promise to renew."   (Ex. 17).

Additional facts will be provided below where appropriate.[4]

---

[3]   The contract was apparently extended in April 2010 for one more month, until June 15, 2010.   (<u>See</u> DR ¶ 32).

[4]   For example, since the issue of standing involves a different set of facts, that issue will be discussed in detail at the end of this decision.   As detailed <u>infra</u>, this court has concluded that Softscape has standing to maintain this action.

[11]

### III.   ANALYSIS

#### A.   Summary Judgment Standard of Review

By its motion, Barclays is seeking summary judgment on each of the plaintiff's claims. "The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"   PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)) (additional quotation omitted).   Accordingly, the burden is upon the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"   Vineberg, 548 F.3d at 56 (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).   "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law."   Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue."   PC Interiors, Ltd., 794 F. Supp. 2d at 275.   "[T]he nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.   LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).   "The Court must view the entire record in the light most hospitable to the non-moving party and

[12]

indulge all reasonable inferences in that party's favor."   PC Interiors, Ltd., 794 F. Supp. 2d at

275.   "Summary judgment is appropriate if, after viewing the record in the non-moving party's

favor, the Court determines that no genuine issue of material fact exists and the moving party is

entitled to judgment as a matter of law."   Id.

**B.      Timeliness of Fraud and Unjust Enrichment Claims**

Barclays contends that Pavonix's claims for fraud and unjust enrichment are barred by a

three year statute of limitations, because in May 2009, Barclays had told Softscape that

"Softscape would not receive the three-year contract purportedly promised in January, leading

Softscape's CEO to believe that Barclays had 'jerked around,' 'screwed,' and 'lied to' Softscape."

(Barclays' Mem. (Docket No. 86) at 12-13 (citing DF ¶ 71)).   Barclays argues that the statute of

limitations commenced at that time, but suit was not filed for more than three years, until

February 22, 2013.   This court finds that Barclays' argument misconstrues Softscape's claims,

and is without merit.

The parties agree that a three year statute of limitations governs the fraud and undue

enrichment claims.   See Mass. Gen. Laws ch. 260, § 2A; Epstein v. C.R. Bard, Inc., No. Civ.A.03-

12297-RWZ, 2004 WL 1598912, at *3 (D. Mass. July 19, 2004) ("The statute of limitations

applicable to unjust enrichment depends upon the 'essential nature of plaintiff's claim.'"

(citation omitted)), aff'd, 460 F.3d 183 (1st Cir. 2006).   The parties agree further that "[t]he

limitations period begins to run 'when a plaintiff discovers, or any earlier date when she should

reasonably have discovered, that she has been harmed or may have been harmed by the

defendant's conduct.'"   Epstein, 460 F.3d at 187 (quoting Bowen v. Eli Lilly & Co., 408 Mass.

204, 205-06, 557 N.E.2d 739, 741 (1990)).    Where the parties disagree, however, is with the description of plaintiff's claims.

Softscape has consistently argued that Barclays wrongfully induced it to provide the upgrade to Version 12 by promising to extend the existing contract; the original three year term was not given the significance by Softscape that Barclays assigns to it.    In fact, the complaint refers to Barclays' misrepresentation of its intent "to enter into a new contract with [Softscape] that would have an 18 month term."    (See Compl. ¶¶ 9, 11, 13, 15).    Nevertheless, Barclays has moved for summary judgment on the grounds that the statute of limitations began to run when Barclays rejected a three year term and proposed an 18 month term.    Thus, Barclays has, in effect, moved for summary judgment on a claim that was not raised in the complaint.[5]

Moreover, there is evidence in the record that Softscape elected to proceed with the upgrade to Version 12 even after Barclays rejected a three year contract, because of repre-sentations made concerning Barclays intent to enter into an 18 month contract.    The fact that Softscape may have been frustrated with Barclays (and *vice versa*) does not, as a matter of law,

---

[5]    There is a very fundamental difference between the parties as to what constitutes the alleged fraud in this case.   Barclays accuses Softscape of seeking to expand its claims, and claims that "Softscape's complaint for fraud, which notably must be pled with particularity under Rule 9(b), specifically alleges that Softscape relied upon false promises by Barclays to pay for work with a contract renewal, not merely with 'good faith negotiations.'"   (Barclays' Reply Mem. (Docket No. 107) at 13).   In this court's view, however, Softscape has not expanded its complaint, which raises the claim that Barclays induced Softscape to perform the upgrade by promising that it would enter into a new 18 month term contract, and making representations to that effect despite the fact that "Barclays had no actual intention of entering into a new contract with [Softscape]."   (E.g., Compl. ¶¶ 9, 10).   Nevertheless, this court recognizes that there may be other pleadings which further define Softscape's claims, and nothing herein is intended to define the scope of admissible evidence or theories at trial.

[14]

prevent Softscape from giving up on a three year contract and settling for an 18 month agreement.   Nor does it prevent Softscape from seeking damages if it can establish that Barclays wrongfully induced it to provide the upgrade to Version 12 by misrepresenting its intention to enter into an extension regardless of its length.   In light of the numerous statements made by Barclays throughout the parties' relationship affirmatively representing its intention to enter into an extended contract, and viewing the evidence in favor of Softscape, a jury could find that Softscape did not know, and should not reasonably have known, that Barclays had never had any intention of entering into a new contract until it received the notice of termination on February 25, 2010.   The record does not support a finding, as a matter of law, that the statute of limitations began to run on the plaintiff's fraud and unjust enrichment claims in May 2009. Therefore, this court recommends that the motion for summary judgment on statute of limitations grounds be denied.

### C.    The Application of English Law

Barclays has moved to dismiss all the claims against it on the grounds that they fail to state a claim under English law.   Specifically, Barclays argues that there is no claim for a violation of Mass. Gen. Laws ch. 93A under English law, and that the claims for fraud and unjust enrichment fail under English law for the same reasons that they fail under Massachusetts law. For the reasons detailed herein, this court finds that there are disputed facts which preclude the entry of summary judgment on Barclays' contention that English law should apply.

"When a federal court's jurisdiction arises from diversity of citizenship, as it does here, the court applies 'the substantive law of the forum in which it sits, including that state's

[15]

conflict-of-laws provisions.'"    Adelson v. Hananel, 641 F. Supp. 2d 65, 81 (D. Mass. 2009)

(quoting Dykes v. DePuy, Inc., 140 F.3d 31, 39 (1st Cir. 1998)), aff'd, 652 F.3d 75 (1st Cir. 2011).

The parties agree that "Massachusetts applies a functional approach to choice of law[,]" which

is the approach "explicitly guided by the Restatement (Second) of Conflict of Laws (1971)."

Levin v. Dalva Bros., 459 F.3d 68, 74 (1st Cir. 2006) (internal quotation omitted).    They also

agree that choice-of-law analysis for the misrepresentation claims is governed by § 148 of the

Restatement (Second) of Conflict of Laws.[6]    They disagree, however, as to which facts are

controlling.

As the Restatement provides in relevant part:

> When the plaintiff's action in reliance took place in whole or in part in a state
> other than that where the false representations were made, the forum will
> consider such of the following contacts, among others, as may be present in
> the particular case in determining the state which, with respect to the
> particular issue, has the most significant relationship to the occurrence and
> the parties:
>
> - (a) the place, or places, where the plaintiff acted in reliance upon the
>   defendant's representations,
> - (b) the place where the plaintiff received the representations,
> - (c) the place where the defendant made the representations,
> - (d) the domicil, residence, nationality, place of incorporation and place of
>   business of the parties,
> - (e) the place where a tangible thing which is the subject of the transaction
>   between the parties was situated at the time, and
> - (f) the place where the plaintiff is to render performance under a con-
>   tract which he has been induced to enter by the false representations of
>   the defendant.

---

[6]    The parties apparently agree that these same considerations should apply to the unjust enrichment
and ch. 93A claims as well.    See Crellin Techs., Inc. v. Equipmentlease Corp., 18 F.3d 1, 11 (1st Cir. 1994)
("when a chapter 93A claim and the requested remedy are highly analogous to a tort claim and remedy,
the chapter 93A claim should be considered as a tort for choice-of-law purposes.").

Restatement (Second) of Conflict of Laws § 148(2) (1971).

Barclays argues the relevant facts are as follows:

> Softscape contracted expressly under English law to provide human resources software to Barclays, a British bank, for use by employees located primarily in the U.K.   Softscape managed the relationship out of its U.K. office, in which Barclays' day-to-day contacts worked.   Gilbert and Scanlon, the two Barclays employees who allegedly made the oral misrepresentations, also worked in the U.K., where all their face-to-face meetings with Softscape took place.   To the extent that Softscape's CEO, Watkins, had telephone conversations with Gilbert and Scanlon, he was likely not in Massachusetts at the time.   The only place that Softscape is aware that the work of the upgrade was performed was Thailand.   The invoice at issue was billed in English pounds.   The U.K. clearly has the most significant relationship to this transaction, and English law should therefore control.

(Barclays' Mem. at 13-14 (record citations omitted)).

For its part, Softscape points to the fact that it had a principal place of business in Massachusetts, and that David Watkins, Softscape's CEO who was "responsible for making final decisions for anything having to do with fiscal or customer-related experiences," and who "had the ultimate decision-making authority on the Barclays relationship" was based in Massachusetts and lived and worked here.   (See Pl. Mem. at 14; DF ¶¶ 6-7).   Softscape disputes Barclays' assertion that Watkins was "not likely in Massachusetts" when he communicated with Barclays, pointing to Mr. Watkins' deposition testimony in which he attested that he traveled extensively, and could not specifically recall where he was when any specific conversation took place.   (See Ex. 1 at 674-76).   More significantly, Softscape rejects Barclays' assertion that its fraud claim is limited to oral representations made by Barclays' executives, and argues that it is relying on a number of communications sent by Barclays' personnel to Softscape to establish that Barclays fraudulently induced it to perform the upgrade without payment.   (See Pl. Mem.

[17]

at 14-15).    It is undisputed that many of these communications were received by Softscape

personnel in Massachusetts.    (See PF ¶ 18; DR ¶ 18).    These included emails, some of which

are described above, as well as draft Agreements reflecting the potential terms for a continued

contractual relationship between the parties.    (PF ¶¶ 17-18).

   There also is a dispute between the parties as to where the actual work was done to

migrate Barclays to Version 12.    In arguing that none of the work was done in Massachusetts,

Barclays relies on the following deposition testimony of Mr. Watkins:

> Q.    During the entire time that you did work for Barclays, was the work –
> and how many offices was – of Softscape was the work being performed?
>
> A.    I don't recall specifically –
>
> Q.    Okay.
>
> A.    – where all the places were that it was performed.    It would be based
> on the people who worked on the project.
>
> Q.    Okay.    So at least – so far as where – as far as you're aware, it could've
> been performed in any of the offices of Softscape?
>
> A.    I don't recall specifically.
>
> Q.    Do you really generally?
>
> A.    I know London was one of the offices involved ... in managing the
> relationship and doing work, and I know we did work in Bangkok as well.
> Other than that, I don't recall ... other places that work may have been done.
>
> Q.    Do you know whether work was done in Hong Kong?
>
> A.    It's possible, but I do not know.
>
> Q.    Okay.    Was work done in Boston or Wayland?
>
> A.    I'm not sure if specific people worked on it in Wayland.    It's possible.

[18]

> Q.   Okay.   And now you mentioned you had a – an office in London.   Did the people from the London office go to visit the offices of Barclays over – over in England?
>
> A.   To the best of my knowledge, yes.
>
> . . . .
>
> Q.   Did anyone from Barclays ever come visit the offices in – you know, in Massachusetts?
>
> A.   I don't recall whether they went to 526 Boston Post Road.
>
> Q.   Okay.   And was that the only office that you had in Massachusetts?
>
> A.   Yes.

(Ex. 1 at 51-52 (objection omitted)).

In opposition to the motion for summary judgment, Mr. Watkins has submitted an affidavit in which he identifies the document produced in litigation which includes the break-down of work performed on the upgrade to Version 12.    (See Ex. 46 ¶ 10).   Therein, he further attests:

> The largest number of Softscape personnel performing work relating to the upgrade were located in Massachusetts.   All the services provided to Barclays were performed on a server located at Softscape's headquarters and at its data centers, both located in Massachusetts.

(Ex. 46 ¶ 11).

Barclays objects to this statement on the grounds that it allegedly directly contradicts Mr. Watkins' prior deposition testimony.   See Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unam-biguous questions, he cannot create a conflict and resist summary judgment with an affidavit

[19]

that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.").    This court finds that there is no direct contradiction and the affidavit can be considered.    A party is not barred "from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition."    <u>Sanchez-Estrada v. MAPFRE PRAICO Ins. Co.</u>, 84 F. Supp. 3d 90, 93 (D.P.R. 2015) (internal quotation omitted).    At his deposition, Mr. Watkins was asked a very broad question and gave a very general answer, making it clear that he did not remember details.    Moreover, at his deposition he did not make any reference to the location of the data centers or server.    Finally, and perhaps most importantly, Barclays has analyzed the information about the individuals who worked on the upgrade, so relevant factual information is available to both parties.[7]    Barclays concluded that only 11.5% of the (billed) cost of the upgrade was derived from individuals located in Massachusetts, and 351.5 hours of the work, or 10.8% of the total hours of work performed on the upgrade, was done by individuals who were based in Massachusetts.    (DR ¶ 15).    However, according to the information provided by Barclays, three people who worked on the upgrade were located in England, six were located in Massachusetts, 14 were located in Thailand, four were located in Hong Kong, one was located in New York, and one person's location was unknown.    (DR ¶ 15). In this court's view, the work distribution for the actual upgrade does not support a finding that English law should control, but is at best neutral as between Massachusetts and the United Kingdom.

---

[7]    Softscape has not had an opportunity to respond to Barclays' analysis of the figures.

For purposes of the motion for summary judgment, it is sufficient to say that there are disputed facts as to where the misrepresentations were made and received, and where the work was performed, among other things, so that the motion should be denied.    Moreover, applying a "functional approach" this court does not believe that the appropriate focus should be on where the actual software development was done.    Rather, this dispute is about what representations were made to Softscape's management and how Softscape responded to the representations.    It appears from the record presently before this court that Massachusetts is the location where the business decision was made to continue to negotiate with Barclays and to continue to upgrade Barclays to Version 12.    Thus, an argument can be made that Massachusetts is not only the place where the plaintiff received most of the representations, but, critically, is also "the state in which [the] plaintiff took action in reliance on [the] defendant's representations[.]"    S. States Police Benev. Ass'n v. First Choice Armor & Equip., Inc., 241 F.R.D. 85, 93 (D. Mass. 2007).    Further development of the record at trial will clarify where the key decision makers from both parties were located and where the business decisions were made, among other things.    Barclays has not met its burden of establishing on this record that it is entitled to a ruling as a matter of law that English law controls this dispute.[8]

---

[8]    In light of this conclusion, this court will not address whether Softscape's claims fail as a matter of English law.    Since, however, Barclays argues that the claims fail under Massachusetts law for basically the same reason, this court will address the sufficiency of the allegations under Massachusetts law, infra.

[21]

D.      **Application of ch. 93A to This Dispute**

Barclays has moved for summary judgment on Softscape's claim under Mass. Gen. Laws ch. 93A on the grounds that the undisputed facts establish that any unfair business practice did not occur "primarily and substantially" in Massachusetts.    For many of the reasons detailed above, this court finds that there are disputed facts which preclude the entry of summary judgment on this basis.

It is undisputed that a claim under Mass. Gen. Laws ch. 93A, § 11 can only be maintained against out-of-state entities if the transactions and actions at issue "occur primarily and substantially within the commonwealth."    Mass. Gen. Laws ch. 93A, § 11.    The Massachusetts Supreme Judicial Court has determined that the analysis under § 11 requires the court to consider the facts "in the context of the entire § 11 claim," and "determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth."    Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 473, 781 N.E.2d 787, 799 (2003).    This is a "fact intensive" inquiry that varies from case to case, and the focus of the court's inquiry must remain on "the purpose and scope" of ch. 93A.    In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 194 (1st Cir. 2009) (internal quotation omitted).    As detailed above, in this court's view, the focus of the inquiry should be on the alleged misrepresentations and the parties' conduct in negotiating (or not) a new agreement, and not on where the actual programming was done to upgrade Barclays to Version 12.

A factual finding that "the alleged misrepresentations were received primarily in [Massachusetts], where their impact primarily was felt," would support the conclusion that the "center of gravity" of the dispute occurred primarily and substantially in Massachusetts.   <u>See</u> <u>Uncle Henry's Inc. v. Plaut Consulting Co.</u>, 399 F.3d 33, 45 (1st Cir. 2005) (rejecting 93A claim because misrepresentations were received in Maine, where their impact was felt).   As detailed above, there is evidence that Mr. Watkins was based in Massachusetts, and that alleged misrepresentations were sent to Softscape in Massachusetts.   Similarly, there is evidence that the decision to continue with Barclays was made in Massachusetts.   "For purposes of the motion for summary judgment, drawing all reasonable inferences in Plaintiffs' favor, that is sufficient to permit a finder of fact to reasonably conclude that any unfair and deceptive practices occurred primarily and substantially in Massachusetts[.]"   <u>Conway v. Licata</u>, No. 13-12193-LTS, 2015 WL 2165901, at *11 (D. Mass. May 8, 2015) (denying summary judgment on 93A claim where plaintiff resided in Massachusetts, received and relied upon many of the alleged fraudulent communications while in Massachusetts, and made payments based on those misrepresentations from banks in Massachusetts), <u>appeal</u> <u>docketed</u>, No. 15-2212 (1st Cir. Oct. 22, 2015).   Therefore, this court recommends that the motion for summary judgment as to Softscape's chapter 93A claim be denied.

**E.       The Merits of the Fraud and ch. 93A Claims**

Barclays has moved for summary judgment on Softscape's claims for fraud and violations of ch. 93A on the grounds that Softscape cannot establish reasonable reliance or

causation of harm.    For the reasons detailed herein, this court finds that there are disputed

facts which preclude the entry of summary judgment on these claims.

"Under Massachusetts law, to recover for fraudulent misrepresentation [the plaintiff]

must allege and prove that: (i) the defendants made a false representation of a material fact

with knowledge of its falsity for the purpose of inducing him to act thereon, (ii) he relied upon

the representation as true and acted upon it to his detriment, and (iii) that his reliance was

reasonable under the circumstances.    Although the reasonableness of a party's reliance is

ordinarily a question of fact for the jury, if no reasonable jury could find the party's reliance

reasonable a court may grant summary judgment."    Rodi v. S. N.E. Sch. of Law, 532 F.3d 11, 15

(1st Cir. 2008) (internal citations omitted).    Similarly, a plaintiff must prove reasonable reliance

to sustain a ch. 93A claim based on fraudulent misrepresentations.    Id. at 19.    Here, Barclays

contends that Softscape cannot establish reliance, because Softscape committed to doing a free

upgrade to Version 12 before any promised contract renewal was discussed, and, in any event,

Softscape was contractually obligated to upgrade to Version 12.    In addition, Barclays argues

that Softscape admitted that it knew Barclays had not guaranteed a contract renewal, and that

it could not have relied on any oral promise because the contract required written work

authorizations.    Finally, Barclays argues that Softscape knew that there had been no agree-

ment on key contractual terms so there could not be reasonable reliance on the promise of a

new agreement.    (See Barclays' Reply Mem. at 15-19).    Again, however, Barclays' arguments

are based on an inappropriately limited reading of Softscape's complaint and emphasis on

selective facts.

[24]

As detailed more fully above, there are disputed facts as to whether Softscape was contractually obligated to provide the upgrade to Version 12 to the level that Barclays wanted free of charge.   There are also disputed facts as to whether Softscape agreed to provide any of the upgrade free of charge before Barclays had made a promise to extend its contract.[9]   The facts relative to what portion of the upgrade, including enhancements, Softscape agreed to provide free of charge are also in dispute.   Therefore, the record does not at this juncture support a finding that Softscape did not rely on Barclays' promise as a matter of law.

The absence of work orders also does not defeat Softscape's claims.   It is undisputed that the parties' contract contained various provisions that required that work undertaken for Barclays had to be reflected in written work and payment authorizations.   (See DF ¶¶ 16-20). Nevertheless, there is record support for Softscape's contention that this requirement was not raised by either party during the months of work and discussion, that the parties were working together to implement the upgrade to Version 12 despite the absence of written documenta- tion, and that it was common practice for the parties to proceed in that fashion.   (See PR ¶¶ 16-20).   "Evidence of the actions of the parties after execution of the contract may . . . be relevant to show a modification, whether written or oral, of an integrated agreement." TransCanada Power Mktg. Ltd. v. Narragansett Elec. Co., 542 F. Supp. 2d 127, 138 (D. Mass. 2008) (and cases cited).   Moreover, "[m]utual agreement on modification may be inferred

---

[9]   Even if a jury were to find that the initial upgrade work was done prior to an agreement to extend, the record might support a finding that the work done after May 29, 2009 was done in reliance on an agreement to negotiate an 18 month extension in good faith, or that the agreement to maintain dual support systems free of charge was based on such promises.

from the conduct of the parties and from the attendant circumstances." Id. (internal

quotation omitted).   The record before this court does not compel a finding that the absence

of a written work order renders Softscape's reliance on Barclays' oral representations

unreasonable as a matter of law.

Finally, the fact that Softscape understood that no final agreement had been reached

does not negate its claims, and Softscape is not seeking to enforce a consummated extension

agreement.   Rather, its claims are premised on its theory that it was wasting its time even

trying to reach an agreement because, despite its representations to the contrary, Barclays had

no intention of finalizing an agreement.   Softscape claims that Barclays was just stringing it

along in order to get a free upgrade.   This is sufficient to state a claim.   See Advanced

Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH, 781 F.3d 510, 516-17 (1st Cir.

2015) ("A party's withdrawal from contractual negotiations may be considered to be a violation

of the duty of good faith if: (1) the withdrawal was arbitrary or without justification; and (2) the

other party had a reasonable expectation that a contractual agreement would be consum-

mated." (applying Puerto Rican law)).   See also Commercial Union Ins. Co. v. Seven Provinces

Ins. Co., 217 F.3d 33, 43 (1st Cir. 2000) (defendant's conduct in "raising multiple, shifting

defenses (many of them insubstantial) in a lengthy pattern of foot-dragging and stringing

Commercial along, with the intent (as its own witnesses admitted) of pressuring Commercial

Union to compromise its claim – had the extortionate quality that marks a 93A violation.");

Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55-56 (1st Cir. 1998) (stringing out process

in order to extract a favorable settlement for less than the amount admittedly owed, and

repeatedly promising to pay and not doing so, states a claim under 93A.    Barclays has not

established that it is entitled to judgment as a matter of law on the merits of Softscape's claims

of fraud and violation of ch. 93A.

**F.      Unjust Enrichment**

Barclays has moved for summary judgment on Softscape's claim of unjust enrichment

on the grounds that Softscape cannot establish such a claim in light of the parties' existing

contract, and that Softscape cannot pursue an unjust enrichment claim where it has an

adequate remedy in law.    This court recommends that Barclays' motion be denied with

respect to this claim as well.

It is well-established that "the existence of a valid express contract between the parties"

bars the application of the equitable doctrine of unjust enrichment as an alternative method of

recovery for the same subject matter.    See Okmyansky v. Herbalife Int'l of Am., Inc., 415 F.3d

154, 162 (1st Cir. 2005) (and cases cited).    That principle has no application here, however,

where the parties did not enter into a contract governing the extension.    Again addressing the

facts in the light most favorable to Softscape, Softscape was induced to perform an upgrade

over and above any work that it was contractually obligated to provide in reliance on a

promised contract that was never consummated, and which Barclays never intended to

consummate.    "A claim of unjust enrichment is appropriate where an agreement is too

indefinite to be enforced or where no contract is made because each of the parties had a

materially different understanding of the terms."    Mass. Eye & Ear Infirmary v. QLT

Phototherapeutics, Inc., 412 F.3d 215, 233-34 (1st Cir. 2005) (internal punctuation and citations

[27]

omitted).    Unjust enrichment mandates "that a person who has been unjustly enriched at the expense of another is required to make restitution to the other."    Id. at 234 (internal punctuation and citation omitted).    Where, as here, the plaintiff has not alleged the existence of an enforceable contract, Softscape can proceed on a theory of unjust enrichment and summary judgment on the unjust enrichment claim is not warranted.

Barclays next argues that unjust enrichment is not available to a party with an adequate remedy at law, so that Softscape's fraud and ch. 93A claims preclude the unjust enrichment claim, regardless whether the legal claims succeed or fail.    See Fernandes v. Havkin, 731 F. Supp. 2d 103, 114 (D. Mass. 2010) (the existence of "Plaintiff's negligence and chapter 93A claims thus preclude a claim for unjust enrichment.    The disposition of those claims is irrelevant.") (and cases cited).    While this is an accurate statement of the law, this court finds the argument premature.    Barclays has asserted that Softscape cannot maintain its fraud and 93A claims as a matter of law for various reasons, including that they do not state viable claims under English law.    This court has found that disputed facts preclude a resolution of those arguments at this juncture.    In this court's view, it is appropriate to allow the unjust enrichment claim to stand at this time until it is finally determined whether Softscape can state a claim under these alternative theories.    See Diviacci v. Affinion Group, Inc., No. 14-10283-IT, 2015 WL 3631605, at *17 (D. Mass. Mar. 11, 2015) (court recommends that motion to dismiss claim of unjust enrichment be denied since a party is entitled to pursue alternative and inconsistent theories)[10]  (and cases cited).

---

[10]   Report and Recommendation adopted, Civil Action No. 14-cv-10283-IT, 2015 WL 3633522 (D. Mass.

**G.**     <u>**Standing**</u>

Barclays contends that Softscape has no standing to assert the claims raised in this

lawsuit because they were sold to SumTotal pursuant to an Asset Purchase Agreement dated as

of August 31, 2010.    (Ex. 2).    Specifically, Barclays argues that the language of the Agreement

is clear and unambiguous, and that the instant claims were assets that were transferred to the

buyer, either as transferred claims or as an account receivable.    Softscape denies that these

claims were transferred to SumTotal.    Softscape contends that the language of the Agreement

does not include the instant dispute or, in the alternative, that the language is ambiguous and

that extrinsic evidence establishes that the claims were not sold to SumTotal.    For the reasons

detailed herein, this court finds that Softscape's arguments are persuasive, and that it has

standing to maintain the instant litigation.

The principles governing contract interpretation are well established.    Thus,

> "Construing the language of a[ ] contract is a question of law for the
> reviewing court." *Affiliated FM Ins. Co. v. Constitution Reins. Corp.,* 416
> Mass. 839, 842, 626 N.E.2d 878 (1994).   A contract is to "be construed to
> give it effect as a rational business instrument and in a manner which will
> carry out the intent of the parties." *Starr v. Fordham,* 420 Mass. 178, 190,
> 648 N.E.2d 1261 (1995), quoting *Shane v. Winter Hill Fed. Sav. & Loan Ass'n,*
> 397 Mass. 479, 483, 492 N.E.2d 92 (1986).   No part of the contract is to be
> ignored; words are to be interpreted in the context in which they are used,
> measured against the background of other indicia of the parties' intent. *Starr,*
> 420 Mass. at 190 & n. 11, 648 N.E.2d 1261.   "[C]ontracts rest on objectively
> expressed manifestations of intent" and not subjective and unexpressed
> expectations. *Beatty v. NP Corp.,* 31 Mass.App.Ct. 606, 612–613, 581 N.E.2d
> 1311 (1991).   As a rule, the meaning of a written document, if doubt is cast,
> is construed against the party that authored it. *Merrimack Valley Nat'l Bank
> v. Baird,* 372 Mass. 721, 724, 363 N.E.2d 688 (1977).

---

June 4, 2015).

Am. Paper Recycling Corp. v. IHC Corp., 775 F. Supp. 2d 322, 328 (D. Mass. 2011).

Pursuant to the Asset Purchase Agreement, Softscape sold substantially all of its assets to SumTotal, "other than the Excluded Assets[.]"   (DF ¶ 2; Ex. 2 at "Recitals" - PAV28598). The "Agreement for the Supply of Services, dated 10/25/2009 by and between Barclays and Softscape, Inc.," as well as various addenda and related contracts, were among the "Excluded Contracts" that were not transferred by the Agreement.   (See Ex. 2 at definition of "Excluded Assets" and "Excluded Contracts" at PAV 28600-01; Schedule 1.1B, ¶¶ 9-16 at PAV 28674-75). The Asset Purchase Agreement provided further that Softscape sold "all claims . . . of every kind and nature with respect to the other Purchased Assets (**and excluding those relating solely to the Excluded Assets**)" to SumTotal.   (DF ¶ 84; Ex. 2 at definition of "Purchased Assets" (ix) at PAV28606 (emphasis added)). Barclays argues that since the claims asserted are not contract-based, they do not relate "solely" to the Excluded Assets.   Therefore, Barclays argues, the claims were sold.

This court disagrees and finds that Barclays is inappropriately focusing on the word "solely" and ignoring the word "relating" in interpreting this provision.   "The phrase 'related to' has a broad meaning in ordinary usage: 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'"   United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 335 (1st Cir. 2003) (quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383, 112 S. Ct. 2031, 2037, 119 L. Ed. 2d 157 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)).   The instant dispute does "relate to" the parties' contracts in that it is concerned with seeking to extend the terms of the parties' contractual

arrangement. Moreover, the dispute between the parties relates "solely" to the Excluded Assets in that it does not involve anything other than the parties' relationship with respect to the software system that is the subject of an "Excluded Asset." Not only does this interpretation give significance to all the terms of the parties' contract, but it also makes the most sense in the context in which the words were used. There is nothing in these provisions which seek to define the claims that are being sold in terms of the legal theories presented, such as contract or tort. A fairer reading of the Agreement is that Softscape's rights and obligations vis-a-vis the employee evaluation software provided to Barclays was not being sold to SumTotal, and that claims relating to that relationship were not being transferred either. Thus, the clear and unambiguous language of the SumTotal Agreement provides that Softscape has standing to maintain the instant claim.

Barclays' contention that the "invoice" Softscape sent it in March 2010 was sold to SumTotal as an "account receivable" is equally unavailing. Softscape sold "all billed and unbilled accounts receivable" to SumTotal. (DF ¶ 86; Ex. 2 at definition of "Purchased Assets" (ii) at PAV28606). The post termination invoice Softscape sent to Barclays is not included in either the list of Accounts Receivable being transferred, or those being retained. (See DF ¶ 87; Ex. 2 at Schedule 1.1E at PAV28682-85; Schedule 5.5(c) at PAV28778). It is clear from the facts that this "invoice" was intended to reflect Softscape's perceived damage claim. In other words, it was sent to reflect the amount of damages Softscape was contending it had suffered as a result of Barclays' having induced it to do the upgrade without executing an extension. It is more appropriately characterized as part of Softscape's claims, since the issue

whether Barclays owes anything to Softscape is in dispute.

Barclays argues that Softscape "admits" that the invoice is an account receivable.    (See Barclays' Mem. at 11).    This argument is not supported by the record.    As Mr. Watkins testified:

> Q.    … And so far as you're concerned, that's still an account receivable?
>
> A.    As far as I'm concerned, that's money owed to me, owed to Softscape – …
>
> Q.    … So the – did you treat it as an account receivable?
>
> A.    I don't know what the finance guys treated it as.
>
> Q.    Okay.    Well, in your mind, was it an account receivable once you sent out the invoice and it wasn't withdrawn?
>
> A.    Sure.

(Ex. 1 at 244-45).    This testimony cannot be read as an "admission" that the disputed invoice Softscape sent to Barclays was an "account receivable" on Softscape's books, or an asset subject to the SumTotal Agreement.

Finally, in the event that the terms of the SumTotal Agreement are found to be ambiguous, the extrinsic evidence establishes that both Softscape and SumTotal agreed and understood that the claims raised in the instant litigation were not transferred to SumTotal. See Smart v. Gillette Co., Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995) ("As a general rule, a court should not consider extrinsic evidence to give meaning to a contract unless the contract's terms are vague or ambiguous.").    For example, Barclays issued a document subpoena to SumTotal and SumTotal was deposed.    Nevertheless, SumTotal has never

[32]

indicated that it owns any of the claims at issue.    Moreover, in the context of their contractual relationship, SumTotal has confirmed to Softscape that "the Sellers have conveyed and delivered the Purchased Assets to the Buyers . . . ."    (Ex. 46 ¶ 16).    Thus, there is no support for Barclays' contention that Softscape sold its claims against Barclays to SumTotal.    Softscape has standing to maintain this action.

## IV.   **CONCLUSION**

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that Barclays' motion for summary judgment (Docket No. 85) be DENIED.[11]

/ s / Judith Gail Dein

Judith Gail Dein
United States Magistrate Judge

---

[11]    The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.    The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.    The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.    See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).    Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).